Our final case for argument today is 23-1977, Azurity Pharmaceuticals v. Alkem Laboratories. Good morning, Your Honors. May it please the Court, T.O. Kong on behalf of Azurity Pharmaceuticals, Inc. The District Court determination that a clear and unmistakable disclaimer was made during prosecution was erroneous. It was a clear and unmistakable error, so to speak. Let me start you out with this basic question about how consisting of claims work for a mixture. If you have a consisting of claim, you have several items in the mixture that are listed A, B, and C, and then the accused infringer adds some D, thinking they're going to be off the hook. Is it kind of a universally accepted approach to an infringement theory to say, well, limitation C, whatever ingredient C is, that sometimes has D in it. So we'll just draw a little dotted line around the D and kind of tuck that in inside the C. I think the phrase Trojan horse was used. Is the Trojan horse theory of mixtures universally accepted as a fine approach? Because it seems like Judge Goldberg, he accepted that, and it's not being challenged. I just want to get your thoughts on that. So without accepting the Trojan horse analogy, yes, it is acceptable because here the flavoring agent has a function to it. And so if another ingredient functions as part of that flavoring agent like it did here, then it is part of the list of ingredients. So yes, it is acceptable. And that was the premise of the fact finder's effort at the Benz trial. The premise was we're going to find out what the propylene glycol is doing, what its function is. So that was how the analysis and the opinion started, but what distracted the court was this disclaimer argument. I understand, but I'm just trying to get at the question of what was the purpose of the Benz trial? That was one of the purposes. That was one of the purposes, yes. Okay. Okay. Continue. Returning to disavowal, there was no clear or unmistakable statement of disavowal in the prosecution history. A review of the entire scope of the prosecution history and its context that it provides to the alleged disclaiming statement shows that at best, the alleged disclaiming statement was subject to multiple reasonable interpretations. I want to focus on two aspects of the prosecution history. What's the interpretation of the disclaimer that makes you win? That the use of propylene glycol in that sentence is a reference to the use of propylene glycol as a carrier. It was excluding that use only. Not any amount of propylene glycol, but the use of propylene glycol as a carrier. So that's a, in other words, one of the things you'd have to do as the fact finder is determine what the propylene glycol is being used for in order to assess a composition claim? What the propylene glycol is being used for in the prior art. Yes. So in the Palapew reference, it very clearly was being used as a carrier, as a solvent. It says so directly in the reference and the testimony at trial. Doesn't the ANDA say that the propylene glycol is a co-solvent? So now we're talking about the issue of infringement. So I'm talking about disclaimer. So if we shift to infringement. I know, but the whole purpose is... Fair enough. So the ANDA does describe the 0.1% PG as a co-solvent, yes. But that's not the end of the analysis. That doesn't end the inquiry. And the district court found that as well. That's why you had a trial. Correct. The inquiry... Could you speak a little bit more about this theory of disclaimer is limited to using PG as a carrier? Because when I read through the prosecution history, I didn't see those words. What I saw were words more like the absence of propylene glycol from our claimed invention, which distinguishes our claimed invention from this reference. So I would point... So that, you know, I've got a limited brain, but that's very clear to me in understanding the scope of the disclaimer. PG is out of this claim. And we're making it super clear by not only telling you this, Mr. Examiner, but we're also going to convert our claim into a consisting of claim. So earlier in prosecution, the very idea of using consisting of came from the examiner. This is recorded in the examiner interview summary, where the examiner says, use consisting of to exclude the glycol as a carrier or a solvent. So that was the purpose of using consisting of. Where in... What is your best statement in the prosecution history? Because I can see and understand clearly the narrative that the district court followed through with various quotes from the prosecution history to arrive at his understanding of the disclaimer. At the moment, I don't understand yours. Phoenix 2673 is the interview summary written by the examiner, where she said that the use of consisting of... Hold on. Hold on. Give us a second. I'll get there. 2673. So this is from the 717 application. There's a similar statement from the 059 application that is found on... I'm a little lost. Is the 717, that did not mature into the 948 patent, did it? It didn't. The 400 application did. Right. So what's the relationship of this application? So what the district court found was that the statements earlier in prosecution for related applications were relevant to the finding of disclaimer for the patent ensued. And so what the examiner here says, and I'm looking at... I'm on Appendix 2673. I'm on the fourth line down. And it says... Sorry. Applicants could amend. I'll wait for you to catch up. It says applicants could amend using consisting of language for the solvent or carrier in order to explicitly exclude the glycol. And so the statement there is, was made in response to the examiner's rejection of the expressed negative limitation that would have excluded PG, any amount of PG that was rejected on a 112 basis. The examiner suggested using consisting of language to expel the PG from the carrier. Not its entirety, but from the carrier. I have a really, really dumb question. But I'm looking at claim number five. Okay. And I see A, a buffering agent. And then I see B, water. And C, sweetener. And D, preservative. And what is the carrier? Water. Water is the only ingredient in that list that's suitable to be a carrier. Okay. So then why didn't you put consisting of before the word water? It is. It says consisting of. No, it's not. It's actually in the preamble to the entire claim. Oh, I apologize. But it's after the consisting of phrase. And so the ingredients are limited. Yes, but when you use it in the preamble, the word consisting of applies to every single one of the things that follow. You could have, and I often see pharma claims, where there are elements that have subs that say, for element B, consisting of only this or this. So even if I were to understand that this related application, which is not the application that was returned to this patent, there was a statement by the lawyer, you can put consisting of to show that you're excluding PG from the carrier. But then a skilled artisan who actually read this claim wouldn't understand you to have done that. Because you didn't choose to put consisting of before the carrier. You chose to put consisting of at the start of the claim, making it clear that you were eliminating PG from everything. I would disagree with that, Your Honor. I think there's more than one way to skin that cat in terms of how to draft that claim to use the consisting of language. I only think there's one way to skin a cat on consisting of. If you put it in the preamble, it's only the stuff after. And I will not allow you to infuse confusion to that part of our law. That has been clear for decades and decades. And we accept that, Your Honor, which is why we argued the 0.1% PG is part of the flavoring agent, a listed ingredient. So we were trying to go outside the list of ingredients. But because Alchem manufactures its product in a way that utilizes PG as a subcomponent of a flavoring agent, the addition of 0.1% PG doesn't change that. Am I mistaken? I thought at the trial that this judge found that that was not accurate, that there is no PG in the flavoring agent of the accused product. What he found was that all of the PG in the product, including the 0.1% PG, interacts with the artificial flavoring. In other words, there's no— No, but didn't he find it was not part of the flavoring agent? It's a yes or no question. I thought there was an express finding in this case by the district court that the PG was not part of the flavoring agent. He had a note, which had three items to it, which he found that because it was separately added, it wasn't part of the flavoring agent. But that is a claim construction position that he adopted that is not consistent with the scope of the claims. But aren't we in an infringement fact-finding question? Because, I mean, one of the ANDA ingredients is grape flavor 501417C, right? Which is an off-the-shelf flavoring agent. Right, which contains 94 or 95% PG. 93% PG. So it's a third-party product? Am I understanding that right? Third-party product? That's correct, Your Honor. It's off-the-shelf. Right. So why was it unreasonable for the district court to look at that ANDA ingredient and say, there's your flavoring agent. It's called grape flavor 501417C. This other thing that the ANDA also identifies, 0.1% PG, that's not the flavoring agent. It's the grape flavor 501417C is the flavoring agent. So why is that unreasonable to reach that fact-finding? I don't think it was reached as a matter of fact. I think it was reached as a matter of claim construction. Well, let's assume for the moment it's a fact-finding. Why would that be unreasonable? Because all the ingredients, according to Alkin's manufacturing process, are added and then thoroughly mixed. And so, as I said, all of the artificial flavor must necessarily interact with all of the PG in the formulation. So all of the PG in the formulation contains some amount of flavoring agent. It imparts flavor. It is an agent of flavor and therefore is a flavoring agent. Well, that's where the district court did make a fact-finding. The district court found, as a matter of fact, that the PG doesn't have a significant enough flavor for itself to be considered the flavoring agent. Right. PG standing alone is not a flavoring agent. Yes. But it could be in a flavoring agent and you could at least, the district court seemed to accept the premise you could draw a dotted line around the extra PG and include it as part of the flavoring agent. That seemed to be the premise of the trial going into it. Correct. But the problem with doing so, I think it traces back to the disclaimer. And I hear what you're saying about the Palapu reference being referenced as a carrier. But isn't the PG in the flavoring agent a carrier? Isn't that what it's doing in the flavoring agent? So a carrier and a co-solvent are two different things. Well, you called it a carrier when you were talking about Palapu, isn't that? When I talked about Palapu, yes, but you shifted to the 0.1% PG and that's the ANDA product, not Palapu. Okay. Okay, so the district court actually found that the terms carrier, solvent, and vehicle all mean the same thing. And there's something different than what they're characterizing as a co-solvent, that small amount of PG and the ANDA. Those are two different things. Did the district court also find that the disclaimer of PG also applies to the co-solvent? He applied it to every amount of PG, including the PG that's in the flavoring agent purchased off the shelf, yes. Because Palapu- Not just the flavoring agent, but the co-solvent. Correct, everything. Palapu goes down pretty low. It goes down to like 1%. Yes, so one of the formulations in Palapu goes down to 1.25%, but Palapu characterized that as a solvent, as a carrier, and the only testimony was that that characterization was accurate. Yes. It's really tough with the claim on a composition where the issues are turning on what ingredients are functioning as. But at a chemical level, the testimony was uncontroverted, and as Your Honor pointed out, there was a factual finding that all of the artificial flavor must necessarily interact with all of the PG, because all of the PG is chemically identical. That means that all of the PG must have some amount of flavoring agent in it, and therefore it is flavored. Is it your view that the PG, the 0.1 PG, is necessarily interacting with just the flavoring agent and not anything else, like the preservative? No, it can certainly interact with the paraben preservative, but that doesn't mean it's not also a flavoring agent. It can be an agent for the paraben as well as an agent for the flavor, and that doesn't take it outside the scope of the claim. Does Xerde have any continuation application claims pending where they're trying to get coverage for this same invention but not using the consisting of? So there was a continuation application that attempted to claim PG in the formulation? I'm saying a current continuation, pending continuation application. Not that I'm aware of, Your Honor. One question I had I couldn't quite piece out from the record. You walked away at some point from a DOE argument, right, in the case? We did not pursue a DOE argument. Right. And was it because there was argument-based prosecution history estoppel on the PG? No, Your Honor. It's because doctrine of equivalence in this context with consisting of is a narrower doctrine, and we didn't think it was a fruitful to explore that, especially when flavoring agent is identified in the ANDA itself. I'm sorry, PG is identified in the ANDA itself as being a flavoring agent. There's no need to go to an equivalent analysis. Different PG? Well, chemically identical and functioning exactly the same once it's mixed into the product, yes.  You want to save some time for rebuttal? Certainly, Your Honor. Okay. Allen Pollack of Windows Marks on behalf of Alchem. Counsel, a question I asked a friend on the other side. Is it correct that the premise of this trial, and there's no dispute at least at a conceptual level, forget the disclaimer, that it would be possible with a claim like this to group the extra PG that's listed on the ANDA in with the flavoring agent? That was something that was accepted going into the trial? No, I don't believe that's accurate. It's like the – it's right in the beginning of the district court's opinion. I understand that. It didn't seem like it was disputed. Certainly – well, we certainly agree that the inclusion of the COSOL makes an infringement finding impossible, but I believe that the inclusion of propylene glycol within the flavoring agent itself should also take us out of these claims. I do agree that the COSOL was the focus of the trial, and that was a factual finding that the district court made that's not clearly erroneous, and I don't see how they get over that. But there are other issues involved. I just wanted to talk about this. Well, I don't understand. If you think PG in the flavoring agent also takes you outside of the scope of these claims, then why did you stipulate to the contrary on page 1773? I understood your stipulation to be limited to PG in flavoring agents and saying that that has no impact on whether it's covered by the claim. We interpreted that differently. The stipulation that you're referencing, I believe, is paragraph 64 of the pre-trial order. I'm – Paragraph 92. Paragraph 92 on page 1773 of the appendix. Yes, that's right. That arose from a discovery dispute that began with request for admission number five that we drafted to try and circumvent an argument that we feared they would raise that would be used essentially from our perspective as an excuse to avoid what we think is the clear and unambiguous language in their many representations and arguments in the file history. It was solely written to address whether in a commercial sense, whether a post could go and find as available flavoring agents that didn't have propylene glycol, had propylene in a real world commercial sense, would not play a role in how you could make this product. That was the sole focus of that request. What you said and what you stipulated to is suitable flavoring agents for use in the asserted claims include flavoring agents with or without PG. That's correct. It's that phrase in the asserted claim that's very bothersome. Yes. It sounds like you are conceding as a matter of claim scope or as a matter of infringement that that limitation, of course, can have PG in it. I accept that. That was not our intent, but I would also add that if it is true that that's to be construed or as a claim construction point, I would also point out that the district court judge is free to reject that, which essentially he did if you look at the district court opinion. What is our standard of review on the district court's interpretation and application of a stipulation? That, I believe, would be reviewed de novo. The interpretation is de novo, I believe, but the application of it to the facts of the case, that would be clearer. I believe we have a case that states that in a brief. I can point it out if ... Well, I mean, district court judges aren't bound by stipulations regarding legal questions, right? Of course. Especially a claim ... This goes to claim construction. Yes. It's not like an underlying factual part of claim construction. That was my point. Even if this is to be considered, as they argue, essentially a joint claim construction position, the judge is free to reject that, which he essentially did. In the district court opinion, he talked about how for his own purposes to understand and resolve this case, he had to construe flavoring agent, and he would not do that in the way that they liked because he viewed that in conflict with the intrinsic record. One problem I have is that if we construe consisting of in claim five as meaning no PG anywhere, you want it to be nowhere, not even in the flavoring agent, right?  But, I mean, in the ANDA, isn't it clear that the flavoring agent has PG in it? Yes. 92.5%. There's never any dispute about that. Don't most flavoring agents have PG? Well, that was the very issue we were trying to resolve in the request for admission, because we were concerned that if it is, in a commercial sense, impossible, at least with artificial flavors, to go out and make a product like this without propylene glycol, we were quite concerned that they would argue that, well, you know, all of our comments regarding propylene glycol in the file history, they all come essentially with an asterisk that says, well, you know, a poster would understand because you really can't make this kind of a product with a flavoring agent that doesn't have propylene glycol. We couldn't possibly have been referring to the flavoring agent. We wanted to cut that argument off. That is exactly what we tried to do. I do agree the wording that ultimately ended up in the controller, perhaps not ideal. So the way the appellant uses that stipulation and the other infringement stipulations is they say, those cut off the disavowal argument. And district court disagreed with that and used the disavowal approach. But the question came up in my mind is sometimes with disavowals, it's not always clear what claim terms the disavowal is actually tied to. What's your position on which claim terms, if any, the disavowal is tied to here? I think that's a very important question to address in this type of claim, a consisting of claim, because I will concede that I think there was some confusion about the interplay between claim construction and disclaimer and claim scope. This came up in the first case we heard from this morning, where I, like Chief Judge Moore and Judge Murphy, I also agree that claim scope is claim construction. That was discussed this morning. I believe counsel for outcomes said that very same thing in the 12C oral argument phase of this case as well. But I think because we're focusing on a consisting of claim and specifically something that's cut out of a consisting of claim, what you're actually construing is not as clear as it might be in a comprising claim. That's one of the reasons why we asked the court, even after we said we didn't think we needed claim construction, we asked the court to do claim construction, because one way to look at that is in a consisting of claim where you're focusing on the things that are not there, one way to do that is to construe the limitations that are there, not to permit the thing that's excluded. It's essentially the same thing, but I do agree it's a little... Okay, I'm struggling just a little bit. So if I were just reading this claim and I didn't pay any attention to the prosecution history at all, I would think consisting of means limited to these items, right? And if flavoring agents include PG, then it could be in there, but you couldn't put PG in there in a different capacity, right? That's the way I would think of it, consisting of claim. Got it. So now we pivot to the disclaimer and the prosecution history, and they say no PG. And the question is, does that mean no PG anywhere, or does that mean no PG in some particular place? Which is, I'm getting at the same thing that Judge Murphy was trying to get at, which is trying to understand what the scope of the disclaimer precisely is. Because if it's no PG anywhere, then it means you can't even have PG in a flavoring agent. Right. That's right. And that was the concern... And... Yeah, go ahead. That was the concern that caused us to draft request for mission number five. But I would say that perhaps the simplest way to address this claim, which of course is a consisting of claims, to recognize that there is no co-solvent limitation in the claim. As long as the factual finding that our co-solvent is indeed a co-solvent, which we believe is correct and certainly not clearly erroneous, there's no way for them to make out an infringement of our product in this case. The district court said that the ANDA characterized the extrapropylene glycol as a co-solvent. The district court said that's not controlling. We all agreed on that? Yes. That is what the district court said. We did disagree with that. And... But not here on appeal? No, I think that's wrong. We did disagree with that in a footnote, in our brief. But as I understand it... That doesn't count. Well... I use case law that says that doesn't count. The issue is that the resolution of what our co-solvent is was resolved in our favor. Okay. So there's nothing for us to appeal. That's my understanding. We offered two reasons why the co-solvent was a co-solvent. One, the ANDA says it's a co-solvent. That's the par case. The judge didn't accept that. So we went for a factual finding where the judge allowed them to put on whatever evidence they liked to try and demonstrate that the co-solvent was something other than a co-solvent, or at least other than a co-solvent in part. I'm not sure what their aim was. But... And he found it in our favor there. So that's an issue that we won, so there's nothing for us to appeal. So I'm not sure where that fits in, frankly. Well, I mean, it's just which ground of affirmance makes more sense to you. Right. Well, the simplest one, I guess, is the factual finding. What, the addition of .1PG takes the ANDA product outside the claim? Yes. And then the alternate ground of affirmance would be the prosecution disclaimer is so extreme that it excludes PG anywhere, including any of the claim ingredients.  And then we would have to somehow deal with what's the best understanding of this so-called suitability stipulation. Correct. I would also answer that the district court judge anticipated this very issue and made an observation that even if he were to accept that the suitability stipulation had some applicability to the flavoring agent, the disclaimer would still apply to the co-solvent. So he's already anticipated. There are a few other points I could happily, could go through, but if you have any other questions, I'm happy to push on and just mention a few other points that I thought are pertinent. This case went through a lot of different phases. At one point, we were talking about the Norian case from this court. Equivalence was a big issue early in the case. Of course, there were two other patents that were asserted against us. They were both dropped. The case had gone through a lot of changes, a lot of different phases, but one part of this case that has never changed, has been continually fought up to this day, is the effort to avoid looking at the prosecution history. They went through a lot of hoops to try and make sure or to try and have the court not look at the prosecution history. What about that one statement in the examiner's summary of the 717 application about the carrier business? Well, first of all, I have a couple of things to say about that. They are the party that said at the trial that the examiner comments don't matter. Now all of a sudden, the examiner comments are critical. So I think that's somewhat inconsistent with the position they argued before. That, of course, is the 717 application, which is not a direct ancestor to the 400 application, which is the application issued as the Mary Foray patent. But certainly, we relied on the 717, so that's fair. But I don't see how that comment helps them. It's not just that comment. There are a legion of comments and amendments that talk about the absence of Brooklyn's license without qualification. There may be some others that talk about Brooklyn glycol in combination with lactic acid. We're not discounting those. But they don't undo the application. I guess what I'm wondering is, do you understand that examiner's summary statement to be talking about the usage of the term consisting of with respect to the carrier element alone as opposed to consisting of for the entire claim? No, I do not. I think it's very clear that the consisting of, as Chief Judge Boyle pointed out, is putting the preamble and applies to all the limitations of the claim, not just the carrier. Actually, it's several parts of the process. But that examiner's summary, what was the examiner trying to get at? Was it trying to get at, hey, you could add a consisting of to the carrier limitation to make it clear that the carrier itself, and only the carrier, excludes PG. And so, therefore, that examiner's statement isn't suggesting that the purpose of getting rid of PG for all pending claims is simply just for the carrier alone, not for the claim convention as a whole. No, I think the part of, I'd have to check the exact claims that were at issue prior to that. But there were some iterations of the claims that did talk about a carrier, and the examiner was not happy with representations about what the carrier had as opposed to the whole formulation. They took out the word carrier. It's not in any of the issued claims. But it might have been at this point. I'd have to check. I don't recall that. There were many different file action, office actions and amendments throughout the prosecution. I think there were a dozen between the first two applications. I don't happen to know whether AZERTY has any pending claims in the continuation that are going after this same invention without the consisting of an agreement. None that are public that I'm aware of.  One other issue I would point out, that they do try and make something of one statement in an application, I believe it's the 421 application, where they told the examiner, first just to warn ourselves, the 421 application is not a descendant of the 400 application, which issued us this patent. It is related, but I guess it's in essence like a cousin second, two times removed or something like that. After the notice of allowance issued in the 400 application, after we had sent the notice letter, in this case, they wrote to the patent office in that application, the 421 application, to say, oh, by the way, you know... Their attempted take back occurred a month after the notice of allowance in this patent. And so the Blue Brief got that wrong. They switched it. There are a couple of things I just wanted to add about that. First of all, that application, that statement was never made in the 400 application or any ancestor of the 400 application. It's a downstream statement that I don't think is the type of statement this Court normally relies on. But there are a couple of other... They're trying to cancel out what they conceded earlier. Exactly. But even in that statement, they don't even make the arguments that they've made in litigation. The big argument they have, and it's pretty much the only response that I can tell they've made, to the statements that they are trying to walk away from in the prosecution history, is every time we spoke about propylene glycol, what we were really talking about is using it as the primary solvent in combination with lactic acid. Neither of those criteria are even in that backtracking statement. I think I'm nearly out of time, but I'm happy to address anything else that remains. Thank you, counsel, for opposing counsel for rebuttal. Thank you, Your Honor. There's four points on rebuttal. The first has to do with the disclaimer argument. So I refer to Appendix 2554, and this is... We agree that in the 421 application, your attempted take back in an office action response came in a month after, not before, the notice of allowance in this patent. I trust Your Honor's conclusion on that. Okay. So Appendix 2554, this is where the examiner responded to the alleged disclaimer remark. And before I get to that point, we have never said the examiner's statements don't count. We said they can't be a disclaimer. But they certainly provide context that is worth considering for one of skill in the art to ascertain what these statements in the prosecution history actually mean. So 2554, this is Claim 16. This is rebutting the alleged disclaiming statement. It says that the way that claim is written, it does not exclude the presence of the polar solvent, the carrier of pallipu, referring to propylene glycol. So the examiner interpreted the literal statement that did not say propylene glycol as a solvent, but understood it meant as a solvent. Because that was the context for this conversation, using consisting of to get rid of PG as a solvent. And so here, the examiner says, no, it actually doesn't exclude propylene glycol as a solvent because of the way that it's drafted. So again, there's more context here that leads to the interpretation of this alleged disclaimer as being at least subject to multiple interpretations. But perhaps more importantly, what the examiner says is that Claim 16 as written is rejected over pallipu because of its scope, the way it was written. Now to contrast that with Claim 20, which was issued, that was a formulation claim, that was much more akin to the claims that eventually issued, including the claims asserted in this case. Claim 20, the description of the claims that they... You said you had four points. You are 35 seconds over your time. How many of your points have you gotten through? I apologize, I'll finish this one. Okay, go for it. Claim 20, the claim was characterized, a consisting of claim, as excluding the glycol, the glycol solvent of pallipu. And because Claim 16 was rejected, again, Claim 16 is where this alleged disavowal occurred. And Claim 20 eventually went on to get issued as written at that time with a minor amendment. If you want to say one sentence about each of the other three points, go. Sure. One sentence. Point two, had Alkin used any other flavoring agent that did not use PEG as part of it, we wouldn't have a case. We agree. But because they did, the inclusion of the additional PEG is a flavoring agent. That's how the molecule behaves. Last point, the co-solvent finding, that's not inconsistent with the notion that the Point 1 PEG does other things in the formulation as well, including act as a failing flavoring agent. Thank you very much. I thank both counsel for their arguments. This case is taken under submission.